# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ABDULADHIM A. ALGHAZWI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE BEAUTY HEALTH COMPANY; ANDREW STANLEICK; and LIYUAN WOO,

Defendants.

Case No. 2:23-cv-09733-SPG-MAA

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT [ECF NO. 67]**

Before the Court is the Motion to Dismiss the Consolidated Second Amended Class Action Complaint (ECF No. 67 ("Motion")) filed by Defendants Andrew Stanleick ("Stanleick"), Liyuan Woo ("Woo," or together with Stanleick, the "Individual Defendants"), and the Beauty Health Company ("BHC" or the "Company"; together with Stanleick and Woo, "Defendants"). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES the Motion.

-1-

## I.    BACKGROUND

### A.    Factual Background

BHC is a business-to-business provider of high-end facial machines, known primarily for its "HydraFacial" brand machines used by spas and beauty parlors. (ECF No. 57 ("SAC") ¶ 2).   BHC operates under a "razor and blade" business model, with approximately half of the Company's revenue coming from the sale of facial machines and half coming from the sale of consumables used to operate the machines. (*Id.*).  In March 2022, BHC launched "Syndeo" as its next generation HydraFacial machine. (*Id.* ¶ 5). BHC promised that Syndeo would provide more personalized skincare treatment through software that tracked client history and preferences. (*Id.*).

Lead Plaintiffs Priscilla Dijkgraaf and Martijn Dijkgraaf ("Plaintiffs") are purchasers of BHC securities, who seek to lead a purported class of BHC investors. (*Id.* ¶ 30).  Plaintiffs allege that, during the period of May 10, 2022, to November 13, 2023, (the "Class Period"), BHC misled investors about the success of Syndeo by failing to disclose critical design flaws even while touting the product's success. (*Id.* at 8).  Plaintiffs bring suit for compensatory damages under the Securities and Exchange Act Sections 10(b) and 20(a), 15 U.S.C. §§ 78j(b) and 78t(a).  In addition to BHC, Plaintiffs name Woo and Stanleick—the former CFO and CEO of the Company—as Defendants.

In the SAC, Plaintiffs rely on information from six Former Employees ("FE") of the Company.  FE-1 was an employee of the Company from early 2020 to May 2023, serving first in a managerial position reporting to the VP of Quality and Regulatory Affairs and, beginning in April 2022, serving as BHC's Director of Quality. (*Id.* ¶ 36).  FE-2 worked as a Capital Sales Manager for BHC beginning in April 2023, selling Syndeo and other HydraFacial machines directly to customers in the field. (*Id.* ¶¶ 38-39).  FE-3 worked as the Director of Sales at BHC from June 2023 to November 2023. (*Id.* ¶ 40).  FE-4 worked as a Capital Sales Manager from late 2020 until summer 2022. (*Id.* ¶ 41).  FE-5 was a Business Development Manager for HydraFacial for several years, including 2022 and 2023. (*Id.* ¶ 42).  FE-6 was a Senior Quality Assurance Manager from June 2023 to April

2024, overseeing the management of HydraFacial's quality management system and coordinating internal audits. (*Id.* ¶ 43). Plaintiffs also rely on information from a single Customer Witness ("CW-1"), who purchased a Syndeo in April 2022 and later started a Facebook group for Syndeo users to exchange troubleshooting techniques. (*Id.* ¶ 45).

In the SAC, Plaintiffs allege the following:

### 1.    Launch of Syndeo (May 2021 – March 2022)

On May 13, 2021, shortly after going public, BHC announced that it intended to bring its next generation HydraFacial system, known as Syndeo, to market in the first half of 2022. (*Id.* ¶ 56). The average retail price of Syndeo would be approximately $43,000, compared to a mid-$30,000 price range for previous systems. (*Id.* ¶ 59). On January 20, 2022, BHC announced the appointment of Stanleick to serve as its President and CEO. (*Id.* ¶ 60).

By the end of 2021, BHC's sales of consumables were contributing less to its overall revenues, dropping from 55.2% of net sales in fiscal year ("FY") 2020 to 46.4% in FY 2021. (*Id.* ¶ 62). This did not match BHC's business plan, which relied on the sale of high-margin consumables to be paired with the low-margin HydraFacial machines. (*Id.* ¶ 64). One cause of the declining consumables sales was that customers increasingly relied on lower-priced, generic serums, rather than Hydrafacial-branded serums and other consumables. (*Id.* ¶ 66).

Syndeo was designed to address this problem, accepting only specially shaped bottles and using RFID technology to reject generic consumables. (*Id.* ¶ 67). Plaintiff alleges that, because of the pressures caused by declining consumables sales, Defendants rushed the launch of Syndeo, conducting only limited testing on employees, friends, family, and select customers in 2021 and early 2022. (*Id.* ¶ 68). For example, during a sales meeting just before launch in early March 2022, FE-4 observed screen glitching, which the Company acknowledged and said would be addressed. (*Id.* ¶ 69). BHC announced the launch of Syndeo on March 7, 2022, touting Syndeo as "a revolutionary

-3-

new digitally connected device co-created with our HydraFacialist community to meaningfully enhance the consumer and provider experience." (*Id.* ¶ 71).

2.    Syndeo 1.0 (March 2022 – July 2022)

Plaintiffs allege that Syndeo was plagued with flaws from the time of its launch. First, Syndeo suffered from cosmetic problems, including fitment issues and blemishes. (*Id.* ¶ 85). FE-1 estimates that these cosmetic problems were present in 30% of the early Syndeo systems. (*Id.* ¶ 86). FE-1 indicates that customers were unhappy with these cosmetic issues both because of the high price of Syndeo and because the machines were intended to be used in an area visible to clients. (*Id.* ¶ 87). Plaintiffs allege that the cosmetic issues resulted from Woo's decision to utilize China-based suppliers for parts as a "cost play," and the SAC states that Woo was repeatedly informed that the new design and suppliers were causing cosmetic issues. (*Id.* ¶¶ 85, 88). Rather than addressing the design or supply issues, Woo told employees to simply replace any complained-of Syndeo machines with new machines. (*Id.* ¶ 89). FE-1 states that the Company received "a lot of complaints" and that it "replaced every machine, no questions asked." (*Id.* ¶ 90). In some cases, the new machines had the same cosmetic problems, resulting in multiple rounds of replacements, including one customer who went through five machines due to cosmetic issues. (*Id.* ¶ 91).

Second, BHC began receiving various complaints about functionality issues with the machines. CW-1 indicates that she reached out to BHC on April 26, 2022, about the Syndeo not drawing serum through the tube and the screen going blank or turning off on its own. (*Id.* ¶ 92). FE-4 states that she probably became aware of a problem with the machines pulling too much solution by the end of March 2022, (*id.* ¶ 70), and she states that she began receiving complaints in early April 2022 of various other issues, including screen issues and pieces falling off the machines, (*Id.* ¶ 94). FE-4 estimates that she received complaints from approximately 85-90% of her customers and states that she reported these complaints to customer service, which tracked the complaints in an internal database. (*Id.*). FE-5 states that, as early as March or April 2022, FE-5 experienced

-4-

problems with the machine's software, including issues with suction and the machine not turning on. (*Id.* ¶ 93). In response to these complaints, the Company would send out replacement devices, without conducting any quality control measures to inspect the replacements. (*Id.* ¶ 96).

Third, BHC learned in late April or early May 2022 that Syndeo systems suffered from a design flaw that caused the machines to routinely clog up, completely preventing use. (*Id.* ¶ 97). Specifically, due to a change in the design contractor from prior HydraFacial machines, a channel in the manifold was designed to be too thin and had a membrane covering it. (*Id.* ¶¶ 97-98). FE-1 indicates that this issue came to light in April or May 2022 and that complaints increased significantly by May or June 2022. (*Id.* ¶¶ 99-100). FE-1 estimated that by late June 2022, more than 20% and as many as 50% of machines were suffering from this issue. (*Id.* ¶ 101). As with other issues, BHC's response was to immediately send out new machines to customers. (*Id.* ¶ 102). FE-1 indicates that BHC had no mechanism for fixing the broken machines and that the Company preferred sending new machines in order to maintain the revenue stream from consumables sales. (*Id.* ¶¶ 103-04).

Plaintiffs allege that the Individual Defendants were aware of these issues. FE-1 indicates that information about the clogging issue was discussed during "Tiger Team" meetings with Woo and in follow-up emails sent to BHC's executive officers. (*Id.* ¶ 107). Woo was also included on weekly "Syndeo issues" emails, consisting of weekly action-items. (*Id.*). FE-4 indicates that Stanleick became personally involved as of June 2022. (*Id.* ¶ 109). On June 14, 2022, Stanleick joined a meeting with FE-4's team in which they discussed issues with Syndeo. (*Id.* ¶ 111). After the meeting, FE-4 received an email from the Executive Vice President of Sales, indicating that he had "talked about [the meeting] at length" with Stanleick and that Stanleick said that "our #1 priority is to focus on Syndeo and getting it back on track; there is nothing that is more important for the organization." (*Id.* ¶ 112). The VP also stated that Stanleick had scheduled a weekly meeting to "understand issues, set dates and hold people accountable." (*Id.* ¶ 113).

Between April and July 2022, BHC's operations and quality teams began working on potential design fixes for the clogging issue. (*Id.* ¶ 120). FE-1, who worked on the quality team, stated that the operations team, led by Woo, steamrolled the quality team and settled on a proposed fix that involved widening the manifold in the machines. (*Id.* ¶¶ 118-19). The quality team ultimately approved the fix despite internal discomfort with the lack of testing. (*Id.* ¶ 121). Woo and Stanleick attended at least one meeting related to the new design tests prior to July 2022. (*Id.* ¶ 123).

Despite their awareness of cosmetic, functionality, and design issues with the Syndeo machines, Defendants made public statements proclaiming the unqualified success of the launch. In a press release on May 10, 2022, Defendants touted the "highly successful launch of Syndeo" and raised the Company's full-year guidance for net sales. (*Id.* ¶ 282). In an earnings call the same day, Stanleick referred to Syndeo as "a revolutionary system that offers significant improvements," stated that he was "thrilled by the strong early feedback we are receiving from the field," and emphasized that the sales team "did an amazing job executing on the first phase of the planned rollout." (*Id.* ¶¶ 286, 288). At a conference on June 19, 2022, Stanleick answered an analyst's inquiry about Syndeo by describing it as a "leap forward in technology" and highlighting its "really handy functional benefits." (*Id.* ¶ 292). Later, in response to a question about what he was most proud of, Stanleick stated that it was "the flawless global launch of Syndeo." (*Id.* ¶ 293).

### 3. Rollout of Syndeo 2.0 (July 2022 – January 2023)

In July 2022, BHC implemented its plan to begin producing "Syndeo 2.0" machines—an internal designation used to refer to machines with the new manifold design and a software fix intended to correct the flow rate issue. (*Id.* ¶ 125). Because of a lag time with manufacturers, the updated production did not occur until approximately September 2022. (*Id.* ¶ 126). In addition to the new machines, the Syndeo 2.0 designation referred to a fix for existing machines in the field, which the Company began to implement in October 2022. (*Id.*).

-6-

On August 9, 2022, BHC issued its Q2 financial results, accompanied by a press release highlighting the Company's "[e]xceptional results driven by acceleration of HydraFacial delivery system placements globally" and the "strong demand for Syndeo." (*Id.* ¶ 297). At an earnings call with investors, Stanleick again stated that the Syndeo rollout had been "a tremendous success" and that, "[h]aving visited with hundreds of providers and consumers across the US, there is an incredible enthusiasm for our new Syndeo delivery system." (*Id.* ¶ 299). Stanleick also indicated that "customers are raving about the connected system and user experience," and he emphasized the "positive feedback we have with US customers." (*Id.* ¶ 301). Later, during a Q&A with analysts, Stanleick stated that the Company was "really thrilled with the launch of Syndeo," that customer feedback "has been very consistent," and that the Company had received "learnings" that Syndeo was "beautiful, it's connected[,] and it gives a great user experience." (*Id.* ¶¶ 302-03).

On September 15, 2022, at an Investor Day conference with analysts, BHC published a presentation, in which it stated that "Syndeo's launch has been next level" and highlighted Syndeo's "elevated design," "enhanced ease-of use and intuitive operation," and "connected experience." (*Id.* ¶¶ 308-09). During the call, Stanleick emphasized the "incredible enthusiasm" for Syndeo, highlighted the feedback from "some of our delighted aestheticians," and stated that "Syndeo represents a game changer in ease of operation, design, and use for our aestheticians." (*Id.* ¶ 311). Another BHC executive noted that the Company was "hard at work enhancing, improving, and optimizing Syndeo in collaboration with our early adopter providers," but he indicated that "customers love the new look" and that Syndeo "makes their life so much easier." (*Id.* ¶¶ 312, 314).

By this time, BHC's liberal return policy meant that Syndeo machines had started to pile up in the Company's warehouse. (*Id.* ¶ 147). FE-1 indicates that, by September or October 2022, the Company was storing approximately 2,000 – 3,000 returned Syndeo machines. (*Id.* ¶ 147). Woo toured the warehouse several times and saw the disorganized state of the returned Syndeos. (*Id.* ¶ 151). Around this time, BHC's warehouse was

inspected as part of an audit by BSI, a private company responsible for International Organization for Standardization ("ISO") certification. (*Id.* ¶ 147). In advance of the audit, BHC rented an adjacent building and stored the returned Syndeos there, which FE-1 asserts was done "to hide the machines from BSI." (*Id.* ¶¶ 148-49).

In September or October 2022, Stanleick and Woo attended the Company's annual management review meetings, at which issues with Syndeo were discussed. (*Id.* ¶¶ 141-42). Stanleick and Woo also received copies of the management review report, which detailed the number and type of complaints that the Company had received. (*Id.* ¶¶ 143-44). FE-1 indicates that the report would have mentioned that approximately 30% of complaints related to cosmetic issues and 20% related to flow issues. (*Id.* ¶ 144).

While Syndeo 2.0 was initially viewed as a success, the problems soon returned. (*Id.* ¶ 165). By late October or November 2022, complaints about clogging began to reach a critical mass. (*Id.* ¶ 166). In addition, the Company began receiving new complaints that the larger channel manifold caused some machines to use too much serum; rather than getting the advertised fifteen treatments per bottle of serum, some customers reported getting only five to six treatments per bottle, significantly cutting their profit margin. (*Id.* ¶¶ 167, 215). Additionally, cosmetic issues continued, including reports of front panels falling off. (*Id.* ¶ 172). According to FE-1, around 20% of customers continued to experience issues with the Syndeo 2.0 machines. (*Id.* ¶ 169). Despite the issues, BHC continued selling the machines and offering replacements upon receiving complaints. (*Id.* ¶¶ 170-71). Woo was apprised of these issues through the Tiger Team process and related emails. (*Id.* ¶¶ 172-73). Stanleick and other BHC executives also acknowledged Syndeo 2.0 issues at sales meetings and quarterly calls. (*Id.* ¶ 174).

On November 8, 2022, BHC issued a press release indicating strong sales "driven by solid demand for Syndeo." (*Id.* ¶ 318). During an earnings call the same day, Stanleick indicated that the Company was "seeing absolutely no slowdown," and Woo stated that consumer "sentiment seems to be strong." (*Id.* ¶¶ 320-21). Stanleick summed up the

positive indications, stating, "six months since the launch of Syndeo, and we couldn't be happier with the rollout." (*Id.* ¶ 322).

In late 2022 or early 2023, BHC learned that one of its subcontractors was using an unauthorized computer chip for Syndeo that caused some machines to be inoperable. (*Id.* ¶ 187). While the problem impacted only a select number of machines, BHC incurred significant costs in hiring technicians to individually fix the machines. (*Id.* ¶ 189).

4. <u>Continued Issues with Syndeo 2.0 and Disclosure of Syndeo 1.0 Issues (February 2023 – July 2023)</u>

By February 2023, CW-1 had received four or five replacement Syndeo machines. (*Id.* ¶ 190). Due to her frustrations with the malfunctions, she created a Facebook group for other Syndeo users. (*Id.*). The Facebook group was active from approximately February to April 2023 and grew to approximately 900 members. (*Id.* ¶ 191). BHC customers posted numerous complaints in the Facebook group about Syndeo machines. (*Id.* ¶¶ 192-95). Stanleick became aware of the group and reached out to CW-1 to speak with her. (*Id.* ¶ 196). Stanleick and CW-1 spoke over the phone on February 10, 2023, and March 16, 2023, with CW-1 describing the conversations as "heated." (*Id.* ¶¶ 196-97). Stanleick also communicated with CW-1 over text. (*Id.* ¶¶ 199-200). In April 2023, the group was removed by Facebook for trademark infringement, and CW-1 was banned from HydraFacial's official Facebook page. (*Id.* ¶ 201).

In a February 27, 2023, press release, BHC made its first disclosure about issues with Syndeo 1.0, stating that the Company had incurred "$2.4 million in non-recurring Syndeo initial program logistics and services costs." (*Id.* ¶ 203). On an earnings call that day, Woo acknowledged the $2.4 million charge but characterized the expense as a "one time program." (*Id.* ¶ 208). Stanleick again referred to Syndeo's "highly successful US launch" but acknowledged that the Company was "learning how to improve the system and the software . . . based on provider feedback." (*Id.* ¶¶ 205, 209). When asked about what the Company had learned, Stanleick declined to provide specific information, stating, "I think in the coming quarters, we'll share more insights with you on what we're learning."

(*Id.* ¶ 209). BHC followed this up with a March 30, 2023, press release announcing the international launch of Syndeo, which stated that "Syndeo has been embraced by HydraFacial's consumer and provider community in the US" and highlighted Syndeo's "upgraded connected functionality and elegant design." (*Id.* ¶ 211).

Syndeo continued to face issues with performance and high levels of returns throughout the first half of 2023. FE-2 indicated that even before starting at the Company in April 2023, they learned of systematic performance issues. (*Id.* ¶ 213). Upon starting at the Company, FE-2 heard from clients that Syndeo overconsumed serums. (*Id.* ¶ 214). FE-1 indicates that, by May 2023, the Company had received more than 5,000 returned Syndeo machines out of approximately 10,000 total sales. (*Id.* ¶ 222). FE-6 states that, upon joining the Company in June 2023, they saw thousands of returned Syndeos in storage and viewed more than 5,000 documented customer complaints. (*Id.* ¶¶ 223-24).

Even so, in a May 10, 2023, press release, BHC announced net sales increases and raised its sales projections based on "strong Syndeo traction globally." (*Id.* ¶ 341). During an earnings call the same day, Stanleick indicated that the Company "expect[ed] growth to continue" and touted "strong Syndeo traction." (*Id.* ¶¶ 342-43). During a May 2023 podcast interview, Stanleick proclaimed that Syndeo's launch had "been a tremendous success" and stated that the launch of Syndeo was "at the heart of" the Company's success over the previous years. (*Id.* ¶ 347). At a June 6, 2023, conference, Stanleick again referred to the launch of Syndeo as "a great success" and emphasized that the Company was "testing and learning, improving the device." (*Id.* ¶¶ 351-52).

Within the Company, issues with Syndeo were spoken about frequently. FE-3 indicates that, while being interviewed, FE-3 learned about numerous issues with Syndeo. (*Id.* ¶ 227). The Company brought on a new Chief Operating Officer to assess the clogging issue and devise a solution. (*Id.*). In July 2023, the Company held a mid-year global sales meeting, which Stanleick attended, at which Syndeo clogging issues were discussed and the Company presented a plan for converting new and existing units. (*Id.* ¶¶ 228-29). FE-2 reports that Stanleick spoke openly about problems with Syndeo during the meeting. (*Id.*

¶ 230).  In August 2023, BHC held a company conference call, led by Stanleick, in which it was announced that the Company would hire two outside engineering firms to deploy upgrades to the Syndeo machines.  (*Id.* ¶ 231).  FE-3 states that the engineering firms were unable to solve the issues and ended up being fired by November 2023.  (*Id.* ¶ 236).

5.    The Disclosures (August 2023 – November 2023)

On August 9, 2023, BHC issued a press release reporting a sharp decrease in gross margin, which it attributed to "an increase in sales of lower margin refurbished systems . . . and the sell-through of higher cost inventory."  (*Id.* ¶ 239).  The Company pointed to "a tightening credit environment" and "U.S. providers await[ing] Syndeo enhancements in the third quarter of 2023 to improve the user experience."  (*Id.*).  In its quarterly report, BHC disclosed that it "launched a voluntary initiative to replac[e] certain componentry in previously manufactured Syndeo delivery systems to increase resistance to inadvertent clogging," which was "expected to result in approximately $5 million in expense during the third quarter."  (*Id.* ¶ 248).  On the same day, the Company announced that Woo had been let go in an "involuntary separation without cause" and would be replaced by a new CFO the following day.  (*Id.* ¶ 241).

In an earnings call the same day, the Company gave a presentation in which it identified Syndeo as the driver for the reduced gross margin and referred to "teething issues" with the product.  (*Id.* ¶ 242).  Stanleick described the same "teething issues" but stated that the Company had "identified simple component upgrades to enhance the system's durability."  (*Id.* ¶ 243).  Stanleick indicated that other projects intended to expand gross margin had been delayed as the Company "dedicated resources to manage Syndeo's teething issues."  (*Id.* ¶ 245).  During the subsequent Q&A, Stanleick divulged that "part of the teething issues were software-related" and part were "user experience and hardware."  (*Id.* ¶ 246).  Specifically, Stanleick stated that the software issues were "related to forcing rinse cycle . . . because we're finding that some of the first generations had some residue build-up and blockage and other ones were simply simple component upgrades."

(*Id.*).   Stanleick described the gross margin issues as "temporary" and stated that the Company had a "fix in place."  (*Id.* ¶ 247).

Following these disclosures, the Company's stock price fell modestly by $0.41, or 5.4%, per share.  (*Id.* ¶ 250).  On September 12, 2023, BHC reaffirmed its sales projections for the following year and disclosed a plan to reduce $35 million in costs and buy back up to $100 million of its common stock.  (*Id.* ¶ 252).  This news caused the stock price to shoot up by more than 24%.  (*Id.* ¶ 198).

On November 13, 2023, BHC issued a press release announcing "$63.1 million in restructuring charges related to device upgrades of early generation Syndeo devices."  (*Id.* ¶ 256).  The press release stated that the continued challenges with the Syndeo system had led the Company to declare all 1.0 and 2.0 Syndeo systems to be obsolete.  (*Id.* ¶ 206).  From then on, the Company announced, it would only be selling the new 3.0 system and would offer existing customers the opportunity to upgrade their older models.  (*Id.*).  The Company also stated that Stanleick would be departing from the Company effective November 19, 2023.  (*Id.* ¶ 259).

In the subsequent earnings call, BHC admitted that "many mistakes were made with regard to Syndeo," leading the company to take "tough actions."  (*Id.* ¶ 260).  The Company described the decline in performance as being "largely a result of provider experience issues with Syndeo in the U.S."  (*Id.* ¶ 261).  The Company disclosed that Syndeo 1.0 had "an issue with low flow and clogs" and that, despite efforts to fix these issues in Syndeo 2.0, "many of the issues continued to persist."  (*Id.* ¶ 262).  However, the Company stated that it was "very pleased" with the performance of Syndeo 3.0 devices and that these devices had "a return rate in line with HydraFacial's low historical benchmark."  (*Id.*).

Following the news, BHC's share price fell by 64.3%.  (*Id.* ¶ 269).  In a survey of the Company's customers conducted afterwards by an outside analyst, 74% indicated that they had experienced issues with Syndeo.  (*Id.* ¶ 271).  In subsequent earnings calls, the Company revealed that, while the core issues with earlier versions were resolved with

Syndeo 3.0, the newest version still has certain functionality issues. (*Id.* ¶ 277). The Company's share price continues to trade at levels far below the pre-disclosure baseline. (*Id.*). In April 2024, BHC disclosed that it was the subject of an SEC investigation. (*Id.* ¶ 279).

## B. Procedural History

On November 16, 2023, the named plaintiff filed a class action suit alleging that the Company's disclosures were materially false or misleading. (ECF No. 1 ¶ 7). On January 16, 2024, three individuals filed motions seeking appointment as lead plaintiff for the putative class. *See* (ECF Nos. 14, 16, 19). On May 2, 2024, the Court granted the motion of Priscilla and Martijn Dijkgraaf and designated them as lead plaintiffs. (ECF No. 31). Plaintiffs then filed the consolidated and amended complaint on July 1, 2024. (ECF No. 39). Defendants filed a motion to dismiss the consolidated complaint on September 30, 2024. (ECF No. 45). On January 8, 2025, just before the hearing on Defendants' motion, the parties stipulated to vacate the hearing, withdraw the motion, and briefly stay the case to complete private mediation. (ECF Nos. 51, 53). On April 14, 2025, the parties filed a status update, indicating that mediation had been unsuccessful. (ECF No. 55). The Court set a schedule for the filing of an amended complaint and for briefing on a renewed motion to dismiss. (ECF No. 56).

Plaintiffs filed the SAC on May 5, 2025. (SAC). Defendants filed the instant Motion on July 11, 2025, (Mot.), along with a request for judicial notice of certain documents, (ECF No. 68 ("RJN")). On August 11, 2025, Plaintiffs filed oppositions to the Motion, (ECF No. 69 ("Opposition")), and the request for judicial notice, (ECF No. 70 ("Opp. to RJN")). On September 2, 2025, Defendants replied in support of the Motion, (ECF No. 74 ("Reply")), and the request for judicial notice, (ECF No. 75).

## II. LEGAL STANDARD

To make out a private claim for securities fraud, a Plaintiff must satisfy three requirements. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690-91 (9th Cir. 2011). First, consistent with Rule 8(a)(2), a plaintiff must provide "a short and plain statement of the

-13-

claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), alleging "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on such a motion, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). However, the Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint," allegations that contradict "matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted).

Second, a plaintiff must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring that fraud claims "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "the manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (internal quotation marks, citation, and alterations omitted); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." (internal quotation marks and citation omitted)). Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

-14-

Finally, a plaintiff must satisfy the additional requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), which "require[s] that a complaint plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted). Under the PSLRA, a complaint must (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1) – (2) (emphasis added).

## III.   REQUEST FOR JUDICIAL NOTICE

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint." (citation omitted)). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, under the doctrines of incorporation-by-reference and judicial notice, courts may consider the contents of certain extrinsic documents "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688.

### A.   Incorporation by Reference

First, pursuant to the "judicially created" incorporation-by-reference doctrine, courts may consider an external document to be "part of the complaint itself" if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted). The doctrine seeks to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A court may also "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.*

-15-

at 1003 (alterations and citation omitted).  However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint."  *Id.*

Defendants request that the Court incorporate four documents referenced in the Complaint: (1) Exhibit 5, a transcript of the Company's Investor Day meeting with analysts on September 15, 2022; (2) Exhibit 6, a press release announcing the Company's Q4 2022 financial results; (3) Exhibit 10, a press release announcing the Company's Q1 2023 financial results; and (4) Exhibit 13, a press release announcing the Company's Q3 2023 financial results.  (RJN at 2-3).  Plaintiffs oppose the incorporation of these documents and argue that Defendants seek to use the documents for the improper purpose of undermining well-pleaded factual allegations in the Complaint.  (Opp. to RJN at 2-5).

The Court concludes that Exhibits 5, 10, and 13 may be incorporated by reference. Plaintiffs reference the substance of the Investor Day call extensively throughout the SAC, and statements made during the Investor Day call form the basis of Plaintiffs' claims of misleading statements or omissions from September 15, 2022.  *See* (SAC ¶¶ 307-14). Similarly, Plaintiffs reference Exhibit 10 at multiple places in the SAC, and statements in the Exhibit form the basis of Plaintiffs' claims of misleading statements on May 10, 2023. *See* (*id.* ¶¶ 217, 341).  Exhibit 13 is also repeatedly referenced in the SAC and serves as the basis for Plaintiffs' allegations of a stock price drop.  *See* (*id.* ¶¶ 256-58).  Exhibit 6, however, is referenced only a single time in the SAC, (*id.* ¶ 203), and does not form the basis of any of Plaintiffs' claims, so the Court will not incorporate it by reference.  *See Khoja*, 899 F.3d at 1003 ("For 'extensively' to mean anything . . . , it should, ordinarily at least, mean more than once.").

In incorporating these documents, the Court is cognizant of the Ninth Circuit's warning in *Khoja* against "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine" that essentially amounts to "unscrupulous use of extrinsic documents to resolve competing theories against the complaint."  *Id.* at 998.  But incorporating documents that are extensively referenced in the Complaint to prevent

"plaintiffs from selecting only portions of documents that support their claims" is the very purpose of the incorporation-by-reference doctrine. *Id.* at 1002. Because these documents were extensively referenced in the SAC, they are being used to contextualize Plaintiffs' statements rather than merely to create a defense to the allegations in the SAC. *See In re Sentinelone, Inc. Sec. Litig.*, No. 23-cv-02786-HSG, 2024 WL 3297150, at \*2 (N.D. Cal. July 2, 2024) ("Although the truth of an incorporated document may not be considered *solely* to dispute *well-pled* facts, the Court need not accept as true conclusory allegations that are contradicted by documents referenced in the complaint.").

### B.    Judicial Notice

Second, judicial notice under Federal Rule of Evidence 201 authorizes courts to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1), (2). Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (internal quotation marks and citation omitted). A court, however, may not "take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999.

Defendants request that the Court take judicial notice of Exhibits 1-4 and 6-13, which are all documents filed by the Company with the SEC between the dates of May 21, 2021, and November 12, 2023. (RJN at 7). Defendants also request judicial notice of Exhibit 14—an excerpt of a chart from Yahoo! Finance showing data related to the Company's common stock—and Exhibits 15 and 16—analyst reports published on September 15, 2022, and August 9, 2023. (*Id.* at 8). Plaintiffs argue that judicial notice of these documents is inappropriate because they were not cited in the SAC and are being used to support competing theories against the SAC. (Opp. to RJN at 6).

As an initial matter, it is clear that all of the Exhibits "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.

-17-

201(b).  Documents publicly filed with the SEC are subject to judicial notice.  *See, e.g.*, *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018); *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-cv-07142-HSG, 2019 WL 3817849, at *5 (N.D. Cal. Aug. 14, 2019).  The same is true for documents showing historical stock prices, *see, e.g.*, *Sentinelone, Inc. Sec. Litig.*, 2024 WL 3297150, at *3; *Kampe v. Volta Inc.*, No. 4:22-cv-2055-JST, 2024 WL 308262, at *7 (N.D. Cal. Jan. 26, 2024), and analyst reports, *see, e.g.*, *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008); *Waterford Twp. Police*, 321 F. Supp. 3d at 1144.

However, "accuracy is only part of the inquiry under Rule 201(b)" and courts "must also consider—and identify—which fact or facts" are being noticed.  *Khoja*, 899 F.3d at 999.  "It is improper to judicially notice a [document] when the substance of the [document] is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes."  *Id.* at 1000 (internal quotation marks and citation omitted).  While a court may "take judicial notice of *undisputed* matters of public record," it may not take notice of "*disputed* facts stated in public records."  *Lee*, 250 F.3d at 690.

For Exhibits 1-4 and 6-13, Defendants ask that the Court take notice of "what statements the documents contain" and of the existence of stock sales disclosed in SEC Forms 4.  (RJN at 7).  SEC filings "should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents."  *Troy Grp., Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1152 (C.D. Cal. 2005) (citation omitted).  Thus, while it "is appropriate for the court to take judicial notice of the content of the SEC Forms 4 and the fact that they were filed with the agency," it is not appropriate to take judicial notice of "[t]he truth of the content."  *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008); *see also Mainman v. Talbott*, No. SACV 09-0012 AG (ANx), 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010) ("[W]hile it may be appropriate to judicially notice the existence of SEC filings and their contents, judicial notice should not be taken of the *truth* of their contents.").  To the extent Defendants request judicial notice of the existence of these SEC filings and their contents, the request is granted.

However, to the extent they ask the Court to notice the truth of the stock sales disclosed in the SEC Forms 4 for purposes of negating scienter, the request is denied.

For Exhibit 14, Defendants ask that the Court take judicial notice of the Company's historical stock price. While it is not clear what purpose Defendants seek to use this information for since Exhibit 14 is not cited in the Motion, the Court will nevertheless take judicial notice purely of the fact of the stock price. *See Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1349 (C.D. Cal. 2014) ("Because [publicly] traded companies historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them."). Finally, as to Exhibits 15 and 16, Defendants seek to use these analyst reports to argue that the market was aware of certain issues with Syndeo. *See* (Mot. at 35). Defendants assert that they intend to use the documents solely to determine what information was disclosed, not for the truth of the matter asserted. (RJN at 8). As other courts have done, the Court will notice the analyst reports for this limited purpose. *See, e.g.*, *In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 855 (S.D. Cal. 2019) (taking notice of analyst reports "not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public").

## IV.    DISCUSSION

To state a claim for a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a plaintiff must allege "(1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024). In the Motion, Defendants contest the adequacy of the allegations as to scienter, falsity, and loss causation. The Court will consider each of these arguments in turn.

### A.    Scienter

To establish scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2)(A). To meet this standard, "a complaint must allege that the defendant made false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (internal quotation marks and citation omitted). Deliberate recklessness is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted).

In assessing whether a complaint gives rise to a "strong inference" of scienter, courts "must consider plausible, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In assessing this question, courts "must consider the complaint in its entirety" rather than looking to "whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-33. Under Ninth Circuit precedent, courts conduct a dual inquiry, asking first "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter," and if not, "whether the insufficient allegations combine to create a strong inference" of scienter. *Zucco Partners*, 552 F.3d at 992.

The Court concludes that the SAC contains sufficient factual allegations such that an inference of deliberate recklessness is at least as compelling as any nonculpable explanation. As detailed above, the SAC exhaustively identifies the timing and means through which Defendants allegedly acquired knowledge about specific defects with Syndeo. The SAC alleges that, despite their knowledge about the many issues plaguing Syndeo, Defendants made repeated, specific, and unqualified representations about Syndeo's success, including its functionality, design, and customer feedback. Based on their alleged knowledge of the state of Syndeo and the content of their statements, the facts alleged in the SAC give rise to a compelling inference that Defendants either intended to

mislead investors or were deliberately reckless about the likelihood of misleading investors.

Defendants' statements about customer feedback are particularly illustrative. For example, on May 10, 2022, Stanleick stated that he was "thrilled by the strong early feedback we are receiving from the field" and emphasized that the sales team "did an amazing job executing on the first phase of the planned rollout." (*Id.* ¶¶ 286, 288). On August 9, 2022, Stanleick stated that customer feedback had "been very consistent [with what] we're hearing," including "really good feedback on" Syndeo's "data connectivity, the improvements in user interface, the touch screen technology, the LightStim LED, et cetera." (*Id.* ¶ 135). On September 15, 2022, Stanleick described the "incredible enthusiasm" for Syndeo and highlighted the feedback from "some of our delighted aestheticians." (*Id.* ¶ 311). On November 8, 2022, Woo stated, "we're very encouraged as we continue to visit our providers and the sentiment seems to be strong." (*Id.* ¶ 182). On February 28, 2023, Stanleick discussed learnings that the Company was gaining from provider feedback, but he declined to share any specific information when asked by analysts. (*Id.* ¶ 209).

The SAC provides specific allegations that belie Defendants' representations that customers were thrilled with Syndeo. For example, the SAC alleges that 30% of Syndeo 1.0 systems suffered from cosmetic issues, (*id.* ¶ 86); that 20-50% of Syndeo 1.0 systems suffered from clogging issues, (*id.* ¶ 101); that 85-90% of FE-4's customers complained about their devices, (*id.* ¶ 94); that the replacement machines suffered from the same issues and that some customers went through multiple machines with the same defects, (*id.* ¶ 91); that, by September 2022, the Company had received 3,000 returned units—so many that the Company had to rent additional warehouse space to store them, (*id.* ¶ 153); that Syndeo 2.0 machines did not resolve these issues, (*id.* ¶ 166); that customers started a Facebook group with over 900 members discussing complaints with Syndeo, (*id.* ¶ 191); that the Company received more than 5,000 customer complaints and more than 5,000 returned

Syndeo machines by May 2023, (*id.* ¶¶ 222, 224); and that 74% of Syndeo customers ultimately reported experiencing issues with their machines, (*id.* ¶ 271).

The SAC also provides specific allegations establishing when and how Defendants learned about these issues. *See City of Dearborn Heights Act 345 Police & Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) ("[P]articularized allegations that defendants had actual access to the disputed information may raise a strong inference of scienter." (internal quotation marks and citation omitted)). The SAC alleges that Woo received reports on Syndeo's cosmetic issues in March 2022 and that she learned of the clogging issues through Tiger Team meetings in April/May 2022. (*Id.* ¶¶ 8, 11, 107). Woo also knew of the high rate of returns, having toured the Company's warehouse half a dozen times and having personally directed employees to follow a policy of "no questions asked" exchanges. (*Id.* ¶¶ 88, 90, 151). Meanwhile, the SAC alleges facts to demonstrate that Stanleick knew by at least June 2022 that Syndeo had serious issues, as he attended a sales meeting discussing the issues, organized weekly "Syndeo Powerhouse" meetings to discuss issues with Syndeo, and declared internally that the Company's #1 priority would be "getting [Syndeo] back on track." (*Id.* ¶¶ 109-13). Both Woo and Stanleick also attended a meeting related to the redesign of Syndeo in July 2022. (*Id.* ¶ 123). According to the SAC, Woo and Stanleick also both had access to internal databases that tracked customer complaints, and these complaints were reported in detail to Defendants through the annual management review process in September/October 2022. (*Id.* ¶¶ 95, 141, 143, 146).

By making repeated statements about customer feedback, Defendants held themselves out to investors as having personal knowledge about customer satisfaction. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (finding scienter to be adequately pleaded where executives "told investors they had real-time access to, and knowledge of, sales information"); *see, e.g.*, (SAC ¶ 299 ("Having visited with hundreds of providers and consumers across the US, there is an incredible enthusiasm for our new Syndeo delivery system.")). Once Defendants chose to tout positive information about

-22-

customer feedback, "they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (internal quotation marks and citation omitted). Given the SAC's allegations that Defendants knew about widespread issues and customer complaints regarding Syndeo, the most compelling inference is that their unqualified statements highlighting positive customer feedback were made with intent to mislead, or at least deliberate recklessness of the likelihood of misleading investors. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 947 (N.D. Cal. 2022) (finding that allegations raised strong inference of scienter "because they strongly suggest that individual Defendants had actual knowledge that the challenged statements . . . would be misleading to investors").

Various other aspects of the SAC contribute to this strong inference of scienter. Even as they touted Syndeo's "flawless" launch, the SAC alleges Defendants secretly convened meetings to redesign the Syndeo machines, and Stanleick stated that getting Syndeo "back on track" was the Company's "#1 priority." (SAC ¶¶ 109, 123). Defendants also rented warehouse space to store the returned Syndeos immediately before an external audit of the warehouse was to take place. (*Id.* ¶ 147). In response to a customer Facebook group highlighting issues with Syndeo, the SAC alleges Stanleick personally reached out to the founder and asked her to take down the group. (*Id.* ¶ 198). After she refused to do so, the group was later taken down by Facebook because of a trademark infringement complaint, and the founder was banned from the Company's official Facebook page. (*Id.* ¶ 201). Taken together, all of these alleged facts add to the inference that Defendants sought to hide public disclosure of problems with Syndeo. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011) (finding strong inference of recklessness where defendant "hired a consultant to review the product," prevented use of the company's name in a negative presentation about the product, and issued a press release suggesting that the product did not have certain side effects).

Defendants' narrow disclosures in SEC filings further contribute to an inference of intentional or deliberately reckless conduct. The Company first disclosed that it had incurred costs in replacing Syndeo 1.0 machines in February 2023. In making this disclosure, the Company described the costs as "$2.4 million in non-recurring Syndeo initial program logistics and services costs," (SAC ¶ 203), and Woo referred to the expense as a "one time program," (*id.* ¶ 208). Given that Syndeo 2.0 was rolled out in July 2022, this disclosure appears to be significantly delayed from when these costs would have been incurred. The $2.4 million cost is also suspiciously small, given the $40,000 price tag for a single Syndeo machine, the fact that sales of the machines are alleged to be "low-margin," and the fact that the Company allegedly had already received 3,000 returned machines by September 2022. Additionally, the reference to this cost as being "non-recurring" and part of a "one time program" is difficult to square with the Company's alleged policy of replacing all defective Syndeo machines, (*id.* ¶¶ 88, 91), and with the Company's alleged knowledge as of October/November 2022 that the Syndeo 2.0 did not fix the clogging issues, (*id.* ¶¶ 166, 169). Similarly, the Company downplayed the significance of the August 2023 disclosures by referring to them as "teething issues" that were "temporary" and could be addressed through "simple component upgrades." (*Id.* ¶¶ 242-43, 247). The SAC sufficiently alleges facts to show that, in making these disclosures, the Company did not come close to fully disclosing the scope of the issues or the Company's unsuccessful efforts to address them. As such, these alleged inadequate disclosures further bolster the inference of scienter.

Defendants raise several contrary arguments. First, Defendants argue that Plaintiffs' theory is one of "fraud-by-hindsight" in that the SAC alleges Defendants only became aware of issues gradually as they emerged. (Mot. at 24). However, as discussed above, Plaintiffs have alleged numerous statements by Defendants that were misleading in light of the information that Defendants knew at the time. While it is true that Defendants only learned information gradually, this does not excuse statements—such as those discussed above about positive customer feedback—that the SAC alleges Defendants knew or should

have known were misleading when made.  Defendants also argue that the SAC does not allege that BHC "had even considered the possibility of declaring Syndeo 1.0 and 2.0 obsolete in advance of the decision in November[] 2023[] to do so." (*Id.* at 25).  However, the strong inference of scienter does not rest on an assumption that Defendants knew all along that Syndeo would end in catastrophic failure.  Instead, this inference comes from Defendants' alleged repeated and unqualified positive statements regarding the appearance, functionality, and customer reception of Syndeo, coupled with their alleged knowledge of issues with Syndeo and its reception that rendered these statements untrue or misleading.  *See Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d at 948 ("Plaintiff need only allege facts that raise the strong inference that individual Defendants were aware of the adverse facts that cut against positive information conveyed in the challenged statements and knew that the challenged statements would be misleading to investors if they failed to disclose such adverse facts.").

Defendants also point to *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046 (9th Cir. 2014), for the proposition that failure to disclose internal efforts to remedy a product defect, absent advance knowledge of the eventual financial impact of the gradually discovered issues, cannot support an inference of scienter. (Mot. at 27).  However, *NVIDIA Corp.* is distinguishable for several reasons.  First, the *NVIDIA* court discounted as "implausible" allegations in the complaint that NVIDIA had first determined the root cause of its product defect a year before making the disclosure. *NVIDIA Corp.*, 768 F.3d at 1057.  Here, as discussed in greater detail below, the confidential witness allegations plausibly establish Defendants' knowledge of Syndeo's defects, such that the Court cannot merely discount them.  Second, the *NVIDIA* court emphasized that, in the computer chip industry, "product defects are so common" that NVIDIA maintains "a reduction to revenue as a cash reserve to cover costs."  *Id.*  The court found that scienter was not adequately alleged in part because the plaintiffs had not alleged that anyone at NVIDIA knew "that NVIDIA's liability would exceed its normal reserve set aside for costs associated with product failures." *Id.* at 1058.  Here, no such reserve exists, so Plaintiffs are not required to plead

specific knowledge of the costs associated with Syndeo's failures. Third, the product failure in *NVIDIA* involved a computer chip inserted into a computer manufactured by a third-party, such that it was necessary for NVIDIA to "investigat[e] the extent of the problem" and determine "whether it [or the third-party] was responsible for it." *Id.* at 1065. Finally and most importantly, the plaintiffs in *NVIDIA* alleged only that NVIDIA's financial statements were misleading because they omitted any reference to the product defect. *Id.* at 1050. Here, by contrast, Plaintiffs allege that Defendants' statements were misleading because they affirmatively highlighted positive aspects of Syndeo while neglecting to mention known issues, thus rendering the omissions misleading "in light of the circumstances under which they were made." 17 C.F.R. § 240.10b-5(b); *see Schueneman*, 840 F.3d at 706 ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors." (internal quotation marks, citation, and alterations omitted)).

Next, Defendants argue that the lack of any allegations of insider stock sales undermines an inference of scienter. (Mot. at 28). It is true that "'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (citation omitted). However, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Here, notwithstanding the lack of any allegations of insider trading, the SAC adequately alleges scienter for the reasons discussed above.

Defendants also contend that the SAC's theory of scienter is "nonsensical" because it "would require the Court to draw the unreasonable inference that BHC knowingly shipped defective Syndeo units to the customers it needed to keep happy to drive high-margin Consumables sales." (Mot. at 29). The Court disagrees that any such inference is unreasonable. The SAC alleges that BHC's revenue model is based on a "razor-and-blade" system, in which approximately half of revenue is derived from low-margin sales of

HydraFacial machines and half is derived from high-margin sales of consumables used in those machines. (SAC ¶ 51). The SAC alleges that Defendants were motivated to push Syndeo to market quickly and without adequate testing because the Company's consumables sales were dropping, due to the use of generic consumables. (*Id.* ¶ 66). Syndeo addressed this problem by introducing compatibility issues with generic consumables. (*Id.* ¶ 67). It is not unreasonable to infer based on this that Defendants had an incentive to downplay issues with Syndeo—including by shipping new Syndeo machines to customers free of charge—in order to maintain sales of high-margin consumables. Contrary to Defendants' arguments, such a policy could be understood to keep customers happy by enabling them to continue to offer Syndeo facials to their end-users.

Finally, Defendants argue that the SAC's reports from former employee and customer witnesses do not support scienter because these witnesses are not sufficiently reliable. (Mot. at 30-32). "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners*, 552 F.3d at 995. "First, the confidential witness whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

The Court finds that the confidential witnesses satisfy these requirements. First, the SAC adequately identifies the confidential witnesses such that their personal knowledge can be inferred. While the SAC does not identify the former employee witnesses by name, it identifies their job titles, duties, reporting structure, and dates of employment, such that the Court can make inferences about the type of information that they would reasonably have been exposed to. *See* (SAC ¶¶ 36-44); *see also Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 882 (N.D. Cal. 2023) (finding employee witnesses to be reliable where the complaint "describ[es] their roles within [the company], how long they were employed

there, the nature of their responsibilities, and, in some circumstances, their exact titles and who they reported to"). The Court finds that the allegations from the former employee witnesses generally align with the times that they were employed at the Company and with the types of information that individuals in those roles would be expected to learn.[1] While it is true that none of the former employee witnesses directly reported to the Individual Defendants, the information that they relate does not rely on direct, personal contact with the Individual Defendants. For example, at various points, the SAC includes copies of the written communications through which the former employees learned the information. *See, e.g.*, (SAC ¶¶ 111-14 (emails that FE-4 received from a manager, detailing conversations between the manager and Stanleick); *id.* ¶ 200 (text messages between Stanleick and CW-1)). Other reports come from meetings attended by the former employees and the Individual Defendants. *See, e.g.*, (*id.* ¶ 173 ("FE-1 said Woo was still involved with the Tiger Team and continued to receive meeting minutes and action plans. . . . FE-1 was on most of the emails of meeting minutes discussing the problems, which recipient list included Defendant Woo."); *id.* ¶ 174 ("According to FE-5, Stanleick and other BeautyHealth executives would acknowledge Syndeo 2.0 issues at sales meetings and quarterly calls."); *id.* ¶ 230 ("FE-2 remembered Stanleick speaking about the Syndeo problems at the company's national sales meeting.")). Second, for the reasons detailed above, the Court also finds that the statements, in combination with the other allegations in the SAC, support a compelling inference of scienter. The fact that some of the statements consist of inadmissible hearsay "does not automatically disqualify [these] statement[s] from consideration in the scienter calculus." *Zucco Partners*, 552 F.3d at 997 n.4. Given the explanations for how the witnesses learned the information, the Court finds that the

---

[1] The Court does not necessarily credit every allegation of the former employee witnesses where those allegations amount only to speculation that exceeds any personal knowledge. For example, because the SAC provides no basis for the Court to infer personal knowledge, the Court does not rely on FE-1's assertion that "the real reason" for moving the returned units into a warehouse was "to hide the machines from BSI." (SAC ¶ 149).

-28-

statements are "sufficiently, reliable, plausible, or coherent," *id.*, such that they support a finding of scienter.

Accordingly, the Court finds that the SAC contains sufficient allegations to support an inference of scienter that is at least as compelling as any nonculpable inference.[2]

**B.    Falsity**

Next, Defendants raise a series of arguments that the challenged statements do not contain actionable misrepresentations or omissions.   First, Defendants argue that the challenged statements were already known by the market, such that Defendants cannot be held liable for any omissions.   Defendants point out that the SAC contains several allegations that suggest Syndeo issues were widely known, including that FE-2 learned of issues before joining Syndeo, that FE-3 learned of the issues during his interview, and that a public Facebook group with 900 members addressed issues with Syndeo.  (Mot. at 34). Defendants also argue that the two disclosures in February and August 2023 provided information to the market about Syndeo's issues.  Finally, Defendants cite the two analyst reports, Exhibits 15 and 16, to argue that the market was aware of issues with Syndeo.

As Defendants argue, "an omission is materially misleading *only* if the information has not already entered the market." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991).  Thus, where "information has been made credibly available to the market by other sources," the failure to disclose material information "may be excused." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989).  However, "[b]efore the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [an] insider's one-sided representations." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996) (internal quotation marks and citation omitted).

---

[2] In so concluding, the Court does not reach the parties' arguments as to the core operations theory.

The Court declines to resolve this factual determination at the motion to dismiss stage. "[A] 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage." *In re Thoratec Corp. Sec. Litig*, No. C-04-03168 RMW, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004); *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 928, 938 n.11 (C.D. Cal. 2002) ("The truth on the market defense presented by the defendants necessarily involves a fact-intensive inquiry which is ill-suited to a motion to dismiss." (citation omitted)); *Sneed v. AcelRx Pharm., Inc.*, No. 21-cv-04353-BLF, 2024 WL 2059121, at *7 (N.D. Cal. May 7, 2024) ("Although Defendants argue that information about DSUVIA's administration, use, and limitations were transmitted to the public with a sufficient degree of intensity and credibility, determining the truth of this assertion would require the Court to engage in an intensely fact-specific analysis that is inappropriate on a motion to dismiss." ).

Defendants also argue that the challenged statements were accurate and therefore not misleading. (Mot. at 36). However, the relevant inquiry is whether the statements were misleading "in light of the circumstances under which they were made." *Matrixx Initiatives, Inc.*, 563 U.S. at 44. As discussed above with respect to the scienter inquiry, at a minimum, Defendants' alleged statements about customer feedback were misleading because they highlighted only positive feedback while omitting any reference to the numerous issues and complaints with the Syndeo machines. *See Schueneman*, 840 F.3d at 706 ("[O]nce defendants [chose] to tout positive information to the market, they [were] bound to do so in a manner that wouldn't mislead investors." (internal quotation marks and citation omitted)).

Next, Defendants argue that the "bespeaks caution" doctrine forecloses Plaintiffs' claims because their statements were forward-looking representations containing "enough cautionary language or risk disclosure to protect . . . against claims of securities fraud."

-30-

(Mot. at 36 (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996) (citation omitted))). Defendants argue that the Company disclosed the risk that Syndeo would be declared obsolete on its March 1, 2022, Form 10-K, which stated, "[i]f our products are found to be, or perceived to be, defective or unsafe, or if they otherwise fail to meet our consumers' expectations . . . we may need to recall some products." (*Id.*). The bespeaks caution doctrine cannot shield Defendants here, however, because many, if not most of their alleged misleading statements were not forward-looking. As identified above, the SAC alleges Defendants issued numerous misleading statements about customer feedback, all of which referred to feedback that the Company had already received. Statements about the Company's flawless rollout were also backwards-looking, referring to the Company's efforts since launch. That the Company disclosed the general possibility of a recall does not provide a safe haven for Defendants' subsequent allegedly misleading statements. *See In re Apple Comput., Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002) ("The making of a cautionary statement on one occasion does not provide a shield to liability for all statements subsequently made.").

Defendants also argue that any omissions were not misleading because Defendants had no affirmative obligation to disclose each and every glitch with Syndeo as it arose. (Mot. at 37). While it true that, in a vacuum, Defendants had no affirmative obligation to disclose every issue with Syndeo, the SAC's allegations of falsity do not rest on any such obligation. Instead, the SAC relies on Defendants' alleged repeated and unqualified statements of Syndeo's success, which Plaintiffs assert created the misleading impression that Syndeo's launch was flawless and that customer feedback was overwhelmingly positive. Having chosen to speak on these issues, Defendants were under an obligation to ensure that their statements were not misleading. *See Schueneman*, 840 F.3d at 706.

Finally, Defendants argue that many of the challenged statements are simply non-actionable puffery. (Mot. at 40-41). "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. . . . [P]rofessional investors, and most amateur investors as well, know how to

-31-

devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (citation omitted). However, "even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143 (internal quotation marks and citation omitted). Here, given the context—including the central importance of Syndeo to BHC's profits, analysts' specific questions about customer feedback, and Defendants' alleged knowledge of the thousands of customer complaints and returned machines—the SAC sufficiently alleges Defendants' statements about positive customer feedback were materially misleading. While Defendants may be correct that some of the other challenged statements are mere puffery, at the motion to dismiss stage, the Court declines to resolve this issue as to each challenged statement. *See, e.g.*, *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1083 n.1 (N.D. Cal. 2015) ("But it's not necessary at this stage to decide which of the defendants' many statements were false or misleading, because at a minimum their statements about year-over-year revenue growth were misleading."); *In re DDi Corp. Sec. Litig.*, No. CV 03-7063 NM, 2005 WL 3090882, at *13 (C.D. Cal. July 21, 2005) (finding that court need not, on motion to dismiss, determine if all statements were actionable as long as enough were actionable to state a cause of action (citing *Cooper v. Picket*, 137 F.3d 616, 623 (9th Cir. 1997)).

Accordingly, the Court finds that at least some of the challenged statements are sufficient to meet the requirements to show a material misrepresentation or omission.

### C. Loss Causation

Defendants next argue that Plaintiffs have failed to adequately allege loss causation. Defendants contend that Plaintiffs' theory is solely premised on the November 13, 2023, disclosure, and they argue that the far more plausible reason for the subsequent drop in stock price is BHC's reporting of its poor financial performance. (Mot. at 42). As evidence of this, Defendants point to the August 9, 2023, disclosure, which they argue "fully

-32-

revealed Syndeo's systemic problems" but did not cause a similar drop in stock price. (*Id.* (internal quotation marks omitted)).

To show loss causation, "the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). "'As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *Id.* (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)). The Ninth Circuit has explained that "loss causation 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). Instead, "[s]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *Id.*

The Court finds that the SAC has plausibly alleged that Defendants' disclosure of Syndeo's issues was at least a "substantial cause" of the drop in stock price. Plaintiffs have pleaded sufficient facts "to give defendants ample notice of [their] loss causation theory, and to give [the Court] some assurance that the theory has a basis in fact." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989–90 (9th Cir.2008). At the motion to dismiss stage, the Court cannot disentangle the effects of the Syndeo disclosures from the effects of the financial disclosures. Indeed, it is not clear that these effects should be disentangled, since the Company disclosed on November 13, 2023, that its poor financial performance was "largely a result of provider experience issues with Syndeo in the US." (SAC ¶ 261). Since Plaintiffs' theory is that the stock price was artificially inflated by Defendants' earlier misleading statements about "provider experiences with Syndeo," it is not clear that there is any meaningful distinction between the Syndeo disclosures and the financial disclosures.

Defendants' cited cases are easily distinguishable in that the fraud disclosures and financial performance disclosures in those cases were not alleged to be directly causally

related. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("The TAC does not allege that the June 24 and August 2 announcements disclosed—or even suggested—to the market that [defendant] was manipulating student enrollment figures company-wide in order to procure excess federal funding, which is the fraudulent activity that [plaintiff] contends forced down the stock that caused its losses."); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (concluding, on summary judgment, that plaintiffs could not show a triable dispute that the "share price dropped as a result of the market learning of and reacting to Defendants' purported fraud, as opposed to [defendant's] poor financial health *generally*" (emphasis added)); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1207 (N.D. Cal. 2008) (finding no plausible allegation of loss causation where disclosure "did not comment on any click fraud issues" on which the complaint was premised).

Accordingly, the Court concludes that Plaintiffs have plausibly alleged loss causation for purpose of a motion to dismiss.

### D. Section 20(a) Claim

Lastly, Defendants argue that Plaintiffs' § 20(a) claim should fail because it is derivative of the § 10(b) claim. Defendants raise no specific argument as to this claim aside from those already addressed. Because the Court finds that Plaintiffs have stated a claim under § 10(b), the Court concludes the same as the § 20(a) claim.

## V. CONCLUSION

For the foregoing reasons, the Court DENIES the Motion.

**IT IS SO ORDERED.**

DATED: September 23, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

-34-